JOHN BISHOP CONSTRUCTION COMPANY *v.* ORLICEK.

5-477                                          272 S. W. 2d 820

Opinion delivered November 8, 1954.

[Rehearing denied December 20, 1954.]

*Goodwin & Riffel,* for appellant.

*J. F. Holtzendorff* and *Frances D. Holtzendorff,* for appellee.

J. SEABORN HOLT, J. This is an action arising under the Workmen's Compensation Law of this State, § 81-

1301, *et seq.,* Ark. Stats., 1947. A single Commissioner initially heard the case and denied the claim and his decision was reviewed and affirmed by the full Workmen's Compensation Commission. The Commission found that the disability and death of the deceased were not the result of an accidental injury arising out of and in the course of his employment, either to cause or aggravation. From this ruling, appellees herein appealed to the Circuit Court. That court held that there was not sufficient competent evidence in the record to support the Commission's Order and reversed the Order and directed the Commission to make an appropriate award in favor of claimants, appellees. This appeal followed.

Appellants assign one issue that the finding of the Commission is supported by substantial evidence and the Circuit Court erred in reversing the Commission.

Certain facts other than medical testimony are substantially undisputed. On August 13, 1950, deceased was working for appellants in the construction of a rice dryer near Hazen, Arkansas. On the day in question, deceased and three other employees were working in a section of the dryer known as the "Tower." The Tower was a section of the dryer that was substantially higher than the rest of the building and contained several levels of rooms approximately 14 x 10 feet and 10 or 12 feet in height. There were numerous holes in the floors of these rooms for the elevator, machinery and equipment that were to be later installed. The walls of the rooms had openings for windows but these were not in place. The deceased and the other workers were on the top floor of the Tower when a fire broke out three floors below in the Tower. This fire was apparently caused by the sparks from an acetylene torch falling to ignite a rubber hose, rubber tires, and an acetylene tank. A black thick smoke enveloped the workmen who were forced to abandon the top floor by means of a rope on the outside of the building. All of the workmen were covered with black soot, and were coughing and spitting a black saliva when they reached a place of safety. The deceased was the last to descend from the Tower, and it was estimated that he

was exposed to the smoke from fifteen to forty-five minutes. Prior to the fire, there was testimony that the deceased, who was 45 years of age, was in good health and physical condition.

On August 16, 1950, the deceased went to a doctor since he had a fever and headache, and following the fire he had complained of his chest hurting and had difficulty in breathing. On August 30, 1950, he was referred to Dr. Erner Jones of Little Rock, and an examination at that time revealed a slight redness and irritation of his throat and a slight decreased breath sound in his lower left base, and a slight elevation of temperature. Three to five days later, a blood count was noticed to be abnormal. The final diagnosis was that the deceased was suffering from acute leukemia. He was treated and dismissed from the hospital on October 1, 1950. Approximately two and a half weeks later he was readmitted to the hospital for treatment. At that time he was described by Dr. Jones to have lost considerable ground to leukemia. Following treatment and some improvement, the deceased was discharged from the hospital on October 18, 1950. On November 1, 1950, he was admitted to a hospital in Searcy, and he died on November 4, 1950. The death certificate cited the cause of death as lymphatic leukemia.

A great number of medical witnesses were called to testify and many medical documents were introduced in this matter to determine primarily if the smoke inhalation was the cause or an aggravation of the leukemia. It was generally agreed that the etiology or cause of this disease is unknown. It suffices to say on this appeal that some of the medical opinion was in accord with the theory that there was a causal connection between the inhalation of hydro-carbons in the smoke and the leukemia. Other medical opinion was to the effect that there was no such connection between the two. Thus it appears that the medical testimony is in conflict.

It is not the province of the Supreme Court nor of the Circuit Court to try cases *de novo* on appeal from the Workmen's Compensation Commission. (Award granted

in the case.)  The Workmen's Compensation Act limits powers of the court to set aside any award made by the Commission to the four instances enumerated in the Act. *Solid Steel Scissors Company* v. *Kennedy,* 205 Ark. 958, 171 S. W. 2d 929.

On appeal from a judgment of the Circuit Court in a Workmen's Compensation case, it is the duty of the appellate court to affirm the award unless it can be said that the award is not supported by substantial evidence. Findings of fact by the Workmen's Compensation Commission are given the same verity as attach to the verdict of a jury and this applies on appeal to the Circuit Court as well as to the Supreme Court from the judgment of the Circuit Court.  *Stroud* v. *Gurdon Lumber Company,* 206 Ark. 490, 177 S. W. 2d 181.

On appeal, the Supreme Court must view testimony in its strongest light in favor of the Commission's findings.  *Hughes* v. *Tapley, Administratrix,* 206 Ark. 739, 177 S. W. 2d 429; *Pearson* v. *Faulkner Radio Service Company,* 220 Ark. 368, 247 S. W. 2d 964.

Where the Commission acting upon sufficient evidence sustains or rejects an award, such findings will not be disturbed on appeal.

In the recent case of *Mechanics Lumber Co.* v. *Roark,* 216 Ark. 242, 224 S. W. 2d 806, in which there was conflicting medical testimony as to the causal relation between an injury and an existing malady (the cause of which was unknown) we said: "Thus it is seen that the testimony of the medical witnesses is in direct conflict. One finds a causal connection between the original injury and the disease.  Another admits the possibility but doubts if there was in fact any connection.  The third does not recognize the possibility.  As we have frequently said in situations of this kind, such conflicting testimony presents a question of fact to be determined by the Commission."

Appellees also argue that they have made a *prima facie* case which would entitle recovery for compensation benefits, within the provisions of the Workmen's Com-

pensation Act of 1939, § 81-1324, Ark. Stats., 1947, which at that time provided: "Presumptions.—In any proceeding for the enforcement of a claim for compensation under this act (§§ 81-1301—81-1349), there shall be a *prima facie* presumption, (1) that the claim comes within the provisions of this act, (2) etc. (Acts 1939, No. 319, § 24, p. 777)."

However, this section of the Workmen's Compensation Law was amended by Initiated Act No. 4 of 1948 so as to omit presumption (1) above and now to read as follows: "81-1324. Presumptions.—In any proceeding for the enforcement of a claim for compensation, the following *prima facie* presumptions shall exist: (1) that the Commission has jurisdiction; (2) that sufficient notice thereof was given, etc. (Init. Meas. 1948, No. 4, § 24, Acts 1949, p. 1420)."

Thus there was no such presumption in the present case favoring appellees, when the alleged claim for benefits arose.

Accordingly, the judgment is reversed and the cause remanded with directions to reinstate the Commission's Order denying compensation.

Justices McFADDIN, MILLWEE and ROBINSON dissent.

ED. F. McFADDIN, Justice (Dissenting). When we adopted the Workmen's Compensation Law we were told that it would make sure that the worker received compensation when he was injured:[1] he would not be obliged to have a jury trial to prove negligence, as his compensation would be paid without such proof. But in the present case the worker's dependents are denied com-

---

[1] In *Birchett* v. *Tuf-Nut Garment Mfg. Co.*, 205 Ark. 483, 169 S. W. 2d 574, Mr. Justice Carter used this clear language: "The theory behind the Workmen's Compensation Act is this: Every industry exposes those engaged in it to certain risks of being hurt, such risks arising out of the mere fact of being engaged in that industry. The policy behind the act is the decision of the people that it is fairer to charge as an expense of the industry (to be paid by the ultimate consumer just as he pays for the raw materials used by the industry) a part of the losses arising from the risks, to which those engaged in that industry are exposed by reason of being so engaged, than it is to let such losses fall entirely upon the employee who gets hurt."

pensation because they cannot prove exactly the nature of the injury and all about how the injury can arise and develop: because the widow and children cannot prove— by all the witnesses—what causes leukemia, the Commission holds that the injury has not been established as having grown out of, or caused by, the work. I refuse to agree to any such result.

I. *Injury In The Course Of The Work.* When stripped of all the big words, the facts here are simple: prior to August 13, 1950, Orlicek was a well, strong, healthy man. He had been engaged in rice farming nearly all of his adult life and had performed hard labor. In May, 1950, he passed a physical examination for a life insurance policy. On August 13, 1950, while working for appellant, Orlicek was exposed to fumes and smoke so strong that he and his co-workers would have been asphyxiated had they not lowered themselves on a rope 30 feet to the ground. Orlicek allowed his fellow-workers to go down first, and therefore, suffered more from the fumes and the smoke than any of the others. When all the workers reached the ground, the exposed parts of their bodies were covered with black soot. They were described as gagging and coughing. They tried to continue their work for that day. The next day Orlicek was so sick that he could work only until noon. He complained of a pain in his chest and was treated by his doctor. He did not respond to the treatment and was unable to resume work. He never worked again; and died on November 4, 1950.

The claim for compensation by Mrs. Orlicek and the minor children is based on the contention that Orlicek's illness and ensuing death were the result of an accidental injury — i.e., the exposure to, and inhaling of, the smoke and fumes from the burning rubber and acetylene, and that this occurred in the course of his employment, and either caused or aggravated leukemia, from which he died.

The Commission has said that the burden was on Mrs. Orlicek and her children to prove[2] that the smoke, fumes, etc., caused or aggravated the pre-existing leukemia condition; and this burden is in the face of the statement by the insurance carrier's doctor-witnesses that no one knows what causes leukemia. **How great is the burden that the widow and her children must bear!**

Prior to inhaling the smoke and fumes, Orlicek was a well, strong man; and he was never well a day after such inhalation. He tried to work the next day and was unable to do so, and complained of a feeling "like a brick" in his chest. Here we have a worker subjected to toxic fumes and great hazard, and collapsing from the result of work, and yet his family is denied compensation. The very purpose of the Workmen's Compensation Law was to allow compensation in such a case; and irrespective of what may or may not cause leukemia, I say that the facts here make a clear case for compensation.

II. *What Causes Leukemia.* But when we get to the scientific question as to whether the inhaling of the toxic fumes was a contributing cause of Orlicek's death, I say a case has been made for compensation. In addition to many reports, a total of seven doctors testified in the case regarding this matter of leukemia.

(1) Dr. Ledbetter gave as his opinion that the shock and the breathing of the fumes could be a contributing cause to Orlicek's death.

(2) Dr. Trotter said he believed it was entirely possible for Orlicek to have contracted leukemia under the conditions that existed in this case; and assuming that Orlicek had chronic leukemia, Dr. Trotter believed it would be possible for his chronic leukemia to have been made acute by exposure to the toxic fumes.

[2] Here is the language of the Commission's opinion: "The burden of proof rests upon the claimants to establish the causal connection as a probability growing out of the evidence. The obscureness of the origin of leukemia and the paucity of knowledge concerning it is not sufficient to remove the burden of proof. We must rely on such medical knowledge as is available from competent sources, even though it is not all that might be desired."

(3)   Dr. Porter Rodgers testified that the inhaling of the fumes could be a contributing cause to the origin of lymphatic leukemia.

(4)   Dr. Rollins gave as his opinion that Orlicek developed an upper respiratory infection from inhaling the fumes and smoke and that the upper respiratory infection caused the leukemia.

(5)   Dr. Jones testified that he did not see Orlicek until August 30th; and while Dr. Jones could find no connection between the inhaling of the fumes and the leukemia, he frankly said that he had no idea what caused leukemia; that the cause was unknown; and that he did not consider himself a specialist on leukemia. Dr. Jones said that medically speaking, the origin of leukemia is unknown.

(6)   Dr. Harris did not see Orlicek until the last of September, 1950, and by that time the diagnosis of leukemia had been made.  While Dr. Harris stated that in his opinion the inhalation of the smoke would not have caused or aggravated the leukemia condition, yet Dr. Harris frankly stated that the cause of leukemia is not known.

(7)   Dr. Wilbur said that case histories, from the chimney-sweeps in England on down to the present, showed some connection between coal tar deposits and leukemia; but Dr. Wilbur did not think Orlicek got enough concentration of these substances to produce leukemia.   Dr. Wilbur frankly stated that he did not know what caused Orlicek's leukemia; and that nobody knew.

So with seven doctors testifying, we have four who give it as their professional opinion that Orlicek's death was caused by his work, and three who say they do not know what causes leukemia.   This *negative testimony,* of not knowing what causes leukemia, certainly is not *positive testimony* to support the insurance carrier's position in urging the Commission to deny compensation. So even if we get down to "what causes leukemia," I

maintain that the Commission should have allowed compensation.

III. *Presumptions.* Finally — and quite apart from the merits — I dissent from that part of the majority opinion which says that under the present law there is no presumption favoring the worker. I maintain there is as much a presumption under the present 1948 law as there was under the previous 1939 law.

Section 24 of the 1939 law said: "In any proceeding for the enforcement of a claim for compensation under this Act, there shall be a *prima facie* presumption, (1) *that the claim comes within the provisions of this act, . . .*"

Section 24 of the 1948 law says: "In any proceeding for the enforcement of a claim for compensation, the following *prima facie* presumptions shall exist: (1) that the Commission has jurisdiction: . . ."

The 1939 Act says the claim "comes within the provisions of the Act"; and the 1948 Act says "the Commission has jurisdiction." These words mean exactly the same thing: the claim would have to come within the provisions of the Act before the Commission has jurisdiction; and if the Commission has jurisdiction, then the claim comes within the provisions of the Act. I cannot understand what the majority means by claiming that these words make any difference in the presumptions that arise under the Act; and this is an additional reason for any dissent.

For the reasons herein stated, I respectfully dissent from the majority opinion.